IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NICOLAS FRASCA<br>AND JENNIFER FRASCA : <br> : <br> v. : <br> : <br>ALLSTATE VEHICLE AND PROPERTY : <br>INSURANCE COMPANY : | CIVIL ACTION<br>No. 25-00307 |

**McHUGH, J.**                                                                                      **November 10, 2025**

## MEMORANDUM

This is a diversity action brought under Pennsylvania law by Plaintiffs Jennifer and Nicolas Frasca against their insurer for breach of contract and bad faith. Defendant Allstate Vehicle and Property Insurance Company has moved for partial summary judgment, arguing that discovery has not produced enough evidence to support a verdict that it acted in bad faith. Because the evidence of record would not be sufficient, Allstate's motion must be granted.

**I.  Relevant Background**

On January 9, 2024, a windstorm caused a tree to fall onto Plaintiffs' home in West Chester, Pennsylvania. Compl. ¶¶ 1, 9, ECF 1-5. At the time of the storm, the property in question was covered by a homeowner's insurance policy that Allstate issued. *Id.* ¶¶ 4-5. The tree caused both structural and interior damage to the property, as well as personal affects, and Plaintiffs timely notified Allstate. *Id.* ¶¶ 9-10. Plaintiffs retained Royal Adjustment Group ("Royal") to assist with their claim. Pls.' Resp. 3, ECF 18. The specific coverages include Dwelling Protection, Other Structure Protection, Personal Property Protection, and Additional Living Expense. Mot. Summ. J. 3, ECF 14-1; *see also* Pls.' Resp. Ex. A ("Insurance Policy"), at 8, ECF 21-2. Plaintiffs allege that Allstate acted in bad faith in two respects: (1) how the company handled the damage to the

home under the Dwelling Protection and Other Structure Protection coverages, and (2) how it handled the damage to personal items under the Personal Property Protection coverage. *See* Pls.' Resp. 6-8. Because of overlapping timelines in the handling of these two distinct claims I will address them separately.

### A. Timeline pertaining to claims for structural damage

Following the January 9, 2024 storm and subsequent damage from the fallen tree, Allstate and Royal scheduled a joint inspection of the property for January 17, but, due to snow, deferred it until January 30. Mot. Summ. J. 9; *id.* Ex. 9 ("Claim File"), at 42, ECF 14-12.[1] During the intervening period between the originally scheduled inspection and the rescheduled date, Royal communicated that it was considering "possibly having an engineer come out" to inspect the damage. Claim File at 44-45.[2] A Royal representative communicated on February 5 that he "may be in the process of getting an engineer out to inspect the property." Mot. Summ. J. 9; Claim File at 41. On February 22, an Allstate representative informed Royal that he would discuss with his colleague the possibility of assigning an engineer. *See* Pls.' Resp. Ex. I ("Feb. 22 Claim File

---

[1] Although Plaintiffs' Response to the Motion for Partial Summary Judgment references its attached exhibits, it uses page numbers that do not exist. *See, e.g.*, Pls.' Resp. 3 ("See Allstate claim file. p. 298; p. 288; collectively Exhibit 'G'."). Furthermore, their electronic filing lacks a table of contents for exhibits, and the attached exhibits are neither divided nor labeled. Their courtesy copy delivered to Chambers similarly lacks a table of contents, and exhibits are not tabbed as required by my Guidelines for Counsel. Because of the difficulty involved in locating the sources to which Plaintiffs refer, I will rely more heavily on citations to the record as supplied by Allstate in instances where both parties include the same documents.

[2] Plaintiffs allege that Royal requested Allstate assign an engineer on January 30, *see* Pls.' Resp. 3, but such a request does not appear in the exhibit cited, nor elsewhere in the record.

Entries"), ECF 21-9.³  Allstate made an initial payment of $79,269.38 for structural damage dated February 27.  Pls.' Resp. 4.

On March 6, Allstate requested additional structural photographs from Royal and communicated a desire for a second inspection following the photograph submissions.  Claim File at 37.  Royal sent the photographs the next day.  *Id.*  Allstate notified Royal that it would inspect the property on March 15, but the inspection did not occur until April 2 due to a reassignment.  Mot. Summ. J. 10; Claim File at 34-36.

On April 6, Allstate communicated that it had requested an engineer, and Royal responded that it had retained its own engineer.  *See* Pls.' Resp. 3-4; Claim File at 32.  Two days later, Allstate informed Royal that Allstate had retained an engineering firm to inspect and prepare a report, and to expect the report approximately three to four weeks following inspection.  Mot. Summ. J. 10; Claim File at 31.  The Allstate engineer inspected the property on April 23.  *See* Mot. Summ. J. Ex. 11 ("McDowell Inspection Reports"), at 2, ECF 14-14.  That same day, Royal provided Allstate with a report from its own engineer's inspection.  Mot. Summ. J. 30.  Allstate's engineer submitted its report to Allstate on May 9 and filed a supplemental report on May 16.  *Id.* at 10-11.  The report was provided to Royal on May 21—just under four weeks following the April 23 inspection.  *See* Pls.' Resp. 4.

A few days later, on May 24, Allstate requested a meeting with Royal at the property to review Allstate's engineering report; the meeting occurred on June 12.  Mot. Summ. J. 11; Claim

---

³ Plaintiffs allege that this occurred on February 2, *see* Pls.' Resp. 3, but the Allstate Claim File cited indicates this conversation occurred on February 22.  Furthermore, Plaintiffs allege that this request for an engineer was not escalated until March 15, *see* Pls.' Resp. 3.  Once again, this is not discernable from the file.

File at 27, 29.  Following this meeting, Allstate made two additional payments for structural damage to Plaintiffs dated June 24 and June 28, for $78,928.23 and $13,500.00, respectively.  Mot. Summ. J. 11.  Allstate sent subsequent payments on September 24 ($302.17), November 2 ($21,613.97), November 13 ($28,790.97), and November 20 ($13,500.00).  *See id.* at 4.  In total, Allstate paid $235,900.72 to Plaintiffs under the Dwelling and Other Structures policies.  *See id.* at 4-5.

During this time, efforts towards rebuilding also began.  Plaintiffs contacted a contractor, Mulroy Bay, in May or June of 2024 and eventually contracted with the company, but not until November.  *Id.* at 5 n.5.  Construction began in January 2025, with Plaintiffs blaming the delay on permit application processes as well as Allstate's "require[ment]" that damaged personal property remain in the Insured Property, which was removed in January.  *Id.* Ex. 6 ("Jennifer Frasca Dep."), at 66:8-20, ECF 14-9.  Following the start of construction, there have also been delays of two to three months caused by weather and supply chain issues.  *Id.* Ex. 1 ("Nicholas Frasca Dep."), at 66:7-67:10, ECF 14-4.  As of July 24, 2025, construction had not been completed, and Plaintiffs had not yet moved back into their home.  Pls.' Resp. 4.

**B. Timeline pertaining to claims for personal property loss**

An Allstate representative sent Royal a spreadsheet on February 1, 2024, with which Plaintiffs were to "identify the contents/personal property being claimed by them as damaged as a result of this loss under the Personal Property Protection coverage."  Mot. Summ. J. 13.  Allstate also requested clear photos of damaged items where possible.  Claim File at 42.  Allstate followed up regarding the status of the personal property spreadsheet on February 16, and Plaintiffs estimated another week before completion.  *Id.* at 40.  Allstate followed up again on February 26, to which Royal responded that Royal "sent it to the [Plaintiffs] for approval" and would have it

4

back to Allstate in approximately two days. *Id.* at 39. On February 29, an Allstate representative spoke with Plaintiff Nicholas Frasca, who stated he was still working on the list. *Id.* at 38. The representative asked if Mr. Frasca would like for Allstate "to place the contents portion on hold until he has time to address the items," to which he responded affirmatively. *Id.* at 38. Allstate again requested that photos be taken, and nothing be thrown away. *Id.* Plaintiffs ultimately returned the personal property spreadsheet to Allstate on July 16, 2024. Mot. Summ. J. 14; Claim File at 25.

On July 22, Allstate communicated to Royal that the claim would move forward pending photographs of damaged items to determine their status as content to be cleaned, repaired, or replaced. Claim File at 24.[4] Royal informed Allstate that some of the items had been thrown away and some were in storage, and that it was in the process of submitting photographs. Claim File at 24. Allstate left a voicemail for Royal on July 29 again requesting photographs and details of damaged items. Claim File at 22-23.

Allstate contacted Royal again on August 5 to request photographs and the list of salvageable versus unsalvageable items, to which Royal responded it had already sent the list. *Id.* at 21-22. The Allstate representative noted that he could not locate the information. *Id.* On August 16, Royal requested a $50,000 advance for personal property damage—a request which Allstate refused. *See* Mot. Summ. J. 14-15; Claim File at 16, 18. Allstate contacted Royal on August 30 and September 4 seeking photos of unsalvageable items, noting that, while it would work on claims for items of which it had photos, Allstate required "supporting evidence of damage to move the

---

[4] Allstate asserts in its memorandum that this conversation occurred on July 17 with Royal employee Jeff Renzi, *see* Mot. Summ. J. 15, but the attached exhibit indicates that the conversation occurred on July 22 with Royal employee Carolyn Prince.

5

claim forward" on the remaining items.  Claim File at 16-17.  Allstate also noted it would be sending vendors to inspect items and author reports.  *Id.* at 16.  Royal responded that some of the items "may have been disposed of due to the length of time it has taken to adjudicate the [unsalvageable personal property] portion of the claim" and that Royal would discuss with Plaintiffs.  *Id.* at 16.  Royal sent additional photos two days later.  *Id.* at 15.

Allstate requested further photographs on September 11, as well as details specifically regarding electronic items so that Allstate could send the information to its vendor StrikeCheck for inspection.  Mot. Summ. J. 15; Claim File at 14.  After reassigning the personal property aspect of the claim to a new representative, Allstate communicated to Royal on September 24 that it believed some of the contents merely required cleaning, not replacement.  Mot. Summ. J. 15.  Royal also agreed to Allstate's offer to have vendors schedule with Royal to inspect electronics, clean contents, and make an unsalvageable list.  Claim File at 12.  StrikeCheck inspected electronics for damage on October 4, issued its report the following day, and Allstate sent the report to Plaintiffs on October 7.  Mot. Summ. J. 16; Claim File at 10.  On October 14, Allstate gave Royal a status update pertaining to the ongoing estimate based on the StrikeCheck report.  Claim File at 9.  That same day, CDRN—the vendor in charge of removing materials and cleaning—communicated to Allstate that it was awaiting Royal's approval to proceed.  *Id.* at 9.

Nearly a month later, Allstate reassigned the personal property claim to a new representative and notified Royal of that change on November 12.  Mot. Summ. J. 16.  Royal ceased representation of Plaintiffs on November 19.  *Id.* at 16.  Mr. Frasca requested an update regarding the material removal and cleaning on November 25 and Allstate notified him that documentation was under review on December 3.  Claim File at 4-5.  Allstate's claim file lacks total clarity, but it appears Allstate representatives had problems internally and externally to

6

coordinate with CRDN.  *See id.* at 3.  On December 10, Allstate sent an update to Plaintiffs, who responded the following day, directing Allstate to communicate through Plaintiffs' counsel.  Mot. Summ. J. 17.  CRDN moved items and addressed unsalvageable items on January 30, 2025.  *Id.*  CRDN submitted its evaluation of the inventory on February 22.  *Id.*  Allstate issued Plaintiffs a check for $48,313.89 on March 12 for personal property damage.  *Id.*

## II.   Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In summary judgment dispositions where the burden of proof ultimately rests with the nonmovant, as it does here, the moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325; *see also Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) ("At the summary judgment stage, the insured's burden in opposing a summary judgment motion brought by the insurer is commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." (citation omitted)).

## III.   Discussion

Pennsylvania law permits parties to bring a claim against insurers for bad faith under 42 Pa. Cons. Stat. § 8371.[5]  To prevail on such a claim, a party must show, by clear and convincing evidence, that the insurer (1) "had no reasonable basis for denying benefits under the policy" and

---

[5] "Section 8371 is a fee-shifting statute which permits an insured to recover attorneys' fees from the insurer. The purpose of awarding attorneys' fees in a bad faith claim is to put the insured back in the position she was in prior to paying an attorney to pursue the underlying claim."  *Off. of Disciplinary Couns. v. Anonymous Att'y*, 327 A.3d 192, 201 (Pa. 2024) (citation omitted).

(2) "knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Berg v. Nationwide Mut. Ins. Co.*, 661 Pa. 370, 386 (2020) (citation omitted). Behavior that merely suffices as negligent does not constitute bad faith. *See Grossi v. Travelers Pers. Ins. Co.*, 79 A.3d 1141, 1148-49 (Pa. Super. Ct. 2013). An insurer's investigation into legitimate coverage issues is similarly insufficient. *See O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906-10 (Pa. Super. Ct. 1999). But an insurer cannot prevail simply by asserting that a dispute is one over the value of a claim. That is so because bad faith "can exist when the insurer fails to make a good faith investigation into the facts or fails to communicate with the claimant." *Devincenzo-Gambone v. Erie Ins. Exch.*, 2025 Pa. Super. 235, 2025 WL 2943127, at *3 (Oct. 17, 2025) (citations omitted). "Bad faith conduct also includes evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Rancosky v. Wash. Nat'l Ins. Co.*, 130 A.3d 79, 94 (Pa. Super. Ct. 2015), *aff'd*, 642 Pa. 153 (2017). On balance, however, Pennsylvania appellate courts have established a demanding standard for bad faith, including the requirement imposed by the Supreme Court that a plaintiff prove the claim by "clear and convincing evidence." *Id.* at 175–76. As the Court of Appeals has characterized Pennsylvania law, "all that is needed to defeat a claim of bad faith under § 8371 is evidence of a reasonable basis for the insurer's actions or inaction." *Gibson v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 182, 191 (3d Cir. 2021).

### A. Handling of claims for structural damage

Plaintiffs argue that Allstate's handling of their claim constitutes bad faith due to Allstate's "extreme delay" in retaining an engineer and waiting to issue supplemental payments until after the June 12 on-site review of the engineer's report. *See* Pls.' Resp. 7; *Grossi*, 79 A.3d at 1153

(noting that Section 8371 applies to an insurer's investigative practices); *Padilla v. State Farm Mut. Auto. Ins. Co.*, 31 F. Supp. 3d 671, 676 n.8 (E.D. Pa. 2014) (finding that delay on the part of an insurer is a relevant factor in a bad faith determination).  Allstate counters that there is no requirement to retain an engineer at all, and that Plaintiffs failed to send their own engineering report until April 23.  *See* Mot. Summ. J. 30.

Plaintiffs' assertions and the undisputed facts fail to establish bad faith.  As the correspondence between Allstate and Royal reflects, engineers are not retained for the investigation of every claim.  Although it took Allstate months to retain an engineer, during that time Allstate was moving the claim forward—notably by issuing the initial February 27 payment for $79,269.38 and requesting and conducting a reinspection.  It is fair for an insurer to wait to issue payments until it has more information, so long as the additional information requested is reasonably necessary.  *See Sanders v. State Farm Ins. Co.*, 47 Pa. D. & C. 4th 129, 139 (Pa. Com. Pl. 2000), *aff'd*, 777 A.2d 516 (Pa. Super. Ct. 2001) (finding an eight-month delay in payment alone insufficient for clear and convincing evidence of bad faith).  And Allstate tendered its first payment by the end of February, even without the benefit of an engineering analysis.  Between the storm on January 7 and the final payment on November 20, Allstate took steps move the claim forward with inspections, reviewing reports, requesting more information from Royal, and resolving differences in estimates with Royal.  There were intermittent delays, but nothing that showed Allstate was ignoring its contractual obligations.  Allstate's performance was not exceptional, but that does not amount to bad faith as it is defined by Pennsylvania law.

Plaintiffs further allege that Allstate acted in bad faith when it awarded them "a mere fraction of what was required to restore the house to its pre-loss condition."  *See* Pls.' Resp. 7. Allstate ultimately paid $235,900.72 to Plaintiffs under the Dwelling and Other Structures policies.

But the record reflects that the amount paid derived from a reasonable deliberative process of inspections and assessments. *See Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 784 (Pa. Super. Ct. 2009) (holding that "bad faith is not present merely because an insurer makes a low but reasonable estimate of an insured's damages"). Furthermore, the amount paid—almost $236,000—is within striking distance of the estimates made by Plaintiffs, not one so low that it raises an inference that Allstate pursued a deliberate strategy to devalue the claim. *See* Mot. Summ. J. Ex. 4, at 81-82, ECF 14-7 (submitting Royal's January 12, 2024, total structural estimate of $228,310); *id.* at 38-39 (submitting Royal's revised total estimate of $248,010 on September 5, 2024); Mot. Summ. J. Ex. 7, at 13, ECF 14-10 (submitting a post-suit estimate of $303,481).

Finally with respect to the claims for structural damage, Plaintiffs contend Allstate operated in bad faith when it "claim[ed] that certain damaged portions of the structure were not covered because they were only cosmetically damaged." *See* Pls.' Resp. 7. Plaintiffs seemingly mischaracterize the engineer report to which they refer; the report determines some damage to be "cosmetic" in the sense that it did not affect the integrity of the structure. *See* Pls.' Resp. 4; *id.* Ex. P ("Eng'g Rpt. Summ."), ECF 21-12. Use of this terminology does not imply bad faith.

**B.      Handling of claims for loss of personal property issues**

Plaintiffs allege that Allstate acted in bad faith regarding its obligations under the Personal Property policy by "completely ignor[ing]" the content loss for nine months and for delaying the removal of contents for a year. *See* Pls.' Resp. 8. The record tells a different tale. Allstate requested documentation of personal property damage on February 1, and Royal did not return the spreadsheet until July 16. During that time, Allstate asked for updates on progress multiple times and ultimately put the contents aspect of the claim on hold at Plaintiffs' behest. After Royal returned the spreadsheet, Allstate then requested from Royal further documentation including

photographs, which were not forthcoming for nearly two months. Allstate's actions in these instances were reasonable claims handling practices. Admittedly, not all the delay is attributable to Plaintiffs or Royal. Allstate seemed unable to locate some information already submitted by Royal and encountered delays in scheduling inspections and services with vendors. Once again, however, weak customer service is not the same as bad faith.

## IV.  Conclusion

For the reasons set forth above, Allstate's Partial Motion for Summary Judgment must be granted. An appropriate order follows.

  /s/ Gerald Austin McHugh  
United States District Judge